

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-25-00579-CV

_____

IN THE INTEREST OF P.W., A CHILD

---

On Appeal from the 231st District Court
Tarrant County, Texas
Trial Court No. 231-736073-23

---

Before Sudderth, C.J.; Womack and Walker, JJ.
Memorandum Opinion by Justice Womack

## MEMORANDUM OPINION

## I. INTRODUCTION

The trial court terminated the parental rights of Appellant Mother,[1] a minor, to her child P.W. upon finding by clear and convincing evidence that termination was in P.W.'s best interest and that Mother had executed an unrevoked or irrevocable affidavit of relinquishment of parental rights. *See* Tex. Fam. Code Ann. §§ 161.001(b)(1)(K), (b)(2), 161.103. Mother's relinquishment affidavit contained a waiver of process. *See id.* § 161.103(c)(1).

In three points, Mother, who was seventeen at trial,[2] complains that the trial court erred because (1) her affidavit was improperly contingent on a Rule 11 agreement, (2) her affidavit was involuntary, and (3) the trial court lacked personal jurisdiction due to her lack of personal service by the Department of Family and Protective Services in its second of two lawsuits and because "[a]ny waiver of service that was part and parcel of an involuntarily signed relinquishment did not import jurisdiction to the court."

Although Mother complains about involuntariness, lack of due process, duress, and coercion, to the extent she preserved these arguments, her trial testimony does not

---

[1]We identify the child's family and others by their relationship to her and the child by her initials. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b).

[2]Eighteen is the age of majority in Texas. Tex. Civ. Prac. & Rem. Code Ann. § 129.001; *see* Tex. Fam. Code Ann. § 101.003 (defining "minor" as "a person under 18 years of age who is not and has not been married or who has not had the disabilities of minority removed for general purposes").

support them, and no new evidence to support them was presented at the hearing on her motion for new trial. Guided by our sister court's reasoning, *see S.A.S. v. Catholic Fam. Servs., Inc.*, 613 S.W.2d 540, 543 (Tex. App.—Amarillo 1981, no writ), and public policy, which focuses on the best interest of the child who is the termination lawsuit's subject and not that of the child's parent,[3] we conclude that the trial court obtained personal jurisdiction over Mother based on her valid relinquishment affidavit's waiver of citation, overrule her three points, and affirm the trial court's judgment.

## II. DISCUSSION

We will begin our discussion with the law applicable to the case.[4]

## A. Personal jurisdiction is required for a valid judgment.

Personal jurisdiction, a vital component of a valid judgment, is dependent upon citation issued and served in a manner provided for by law. *In re E.R.*, 385 S.W.3d 552, 563 (Tex. 2012). If service is invalid, it is of no effect and cannot establish the trial court's jurisdiction over a party. *Id.* A complete failure of service deprives a litigant of

---

[3]The best interest of the child who is the termination petition's subject is *always* the primary consideration. *See* Tex. Fam. Code Ann. § 153.002; *In re J.P.-L.*, 592 S.W.3d 559, 562 (Tex. App.—Fort Worth 2019, pet. denied).

[4]We begin with the law, not the facts, because the trial court's best-interest finding does not feature in this appeal: an affidavit of voluntary relinquishment, absent unusual or extenuating circumstances, satisfies the best-interest finding. *See* Tex. Fam. Code Ann. § 161.103(b)(6) (requiring affidavit to contain a best-interest allegation), § 161.211(c) (limiting grounds to attack order terminating parental rights based on unrevoked relinquishment affidavit to fraud, duress, or coercion in the affidavit's execution).

due process and a trial court of personal jurisdiction; the resulting judgment is void and may be challenged at any time. *Id.* at 566. Whether personal jurisdiction exists is a question of law that we review de novo. *J.M. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-22-00435-CV, 2023 WL 213928, at *3 (Tex. App.—Austin Jan. 17, 2023, pet. denied) (mem. op.) (citing *Old Republic Nat'l Title Ins. v. Bell*, 549 S.W.3d 550, 558 (Tex. 2018)).

### 1. Minority is a legal disability.

Minors are generally considered to be under a legal disability and are therefore unable to sue or be sued in their individual capacities and are required to appear in court through a legal guardian, a "next friend,"[5] or a guardian ad litem. *Austin Nursing Ctr., Inc. v. Lovato*, 171 S.W.3d 845, 849 (Tex. 2005); *see generally Matter of W.L.C.*, 562 S.W.2d 454, 454–55 (Tex. 1978).[6] "The doctrine of the disability of minors rests upon the presumption of the want of legal capacity to perform a valid binding act." *Wheeler v.*

---

[5] *See* Tex. R. Civ. P. 44 (stating that minors may be represented by a "next friend" under specific circumstances); *see also Am. Gen. Fire & Cas. Co. v. Vandewater*, 907 S.W.2d 491, 491–93 (Tex. 1995) (concluding trial court properly acquired jurisdiction over minor when his mother answered as his next friend, showing that his legal representative knew about the proceedings and could therefore defend against them, particularly when the trial court also appointed as the minor's guardian ad litem the same one used in the same parties' earlier federal lawsuit).

[6] *Cf.* Tex. Fam. Code Ann. § 31.001(a)–(b) (allowing minor to petition to have the disabilities of minority removed at age sixteen or seventeen, depending on specific circumstances, and to file the petition in his or her own name).

*Ahrenbeak*, 54 Tex. 535, 538 (1881). It is an almost universal rule that this disability exists "except in cases where the law has made express or implied exceptions." *Id.*

As our analysis below will reveal, such an exception applies in this case.

### 2. With exceptions, minors may not waive service.

Historically, when a minor "is made a party to an action, [the minor] must be served with process" and "cannot waive service like an adult and cannot authorize someone else to do so" on his or her behalf. *Wright v. Jones*, 52 S.W.2d 247, 251 (Tex. Comm'n App. 1932, holding approved). Although the supreme court has not specifically addressed service on a minor parent in a termination-of-parental-rights case, *see Tex. Dep't of Fam. & Protective Servs. v. N.J.*, 644 S.W.3d 189, 194 (Tex. 2022) (Lehrmann, J., concurring), it has addressed the requirement of service on a minor in a juvenile case involving transfer to district court for criminal proceedings, *see W.L.C.*, 562 S.W.2d at 454–55.

The issue in *W.L.C.* was whether the presentation of a document entitled "Precept to Serve" to a minor during his transfer hearing was sufficient service to successfully invoke the juvenile court's jurisdiction. *Id.* At the transfer hearing's beginning, W.L.C.'s counsel objected that the summons on W.L.C. had not been returned and was not on file with the court. *Id.* at 455. The trial court overruled the objection and proceeded with the hearing until a probation officer testified that he had no personal knowledge of whether W.L.C. had been served. *Id.* The trial court then ordered the court clerk to serve W.L.C. in open court. *Id.*

5

After the clerk handed the precept to W.L.C., the transfer hearing continued, and at its conclusion, the juvenile court waived its jurisdiction and transferred W.L.C. to the district court. *Id.* The only documentary evidence of service in the record was the instrument entitled "Precept to Serve," executed by the clerk, which directed the sheriff to serve W.L.C. with a copy of the State's original petition. *Id.* The return-of-service form on the precept's reverse side was blank. *Id.* The intermediate court nonetheless affirmed, holding that the probation officer's testimony did not conclusively establish that W.L.C. had not been served with process. *Id.*

The supreme court reversed because that holding was "in conflict with [S]ections 53.06(e) and 54.02(b) of the Texas Family Code." *Id.* Section 53.06 requires the juvenile court to direct issuance of a summons to, among others, "the child named in the petition," and states, "A party, *other than the child*, may waive service of summons by written stipulation or by voluntary appearance at the hearing." Tex. Fam. Code Ann. § 53.06(a), (e) (emphasis added). Section 54.02(b) requires Section 53.06's petition and notice requirements to be satisfied. *Id.* § 54.02(b).

As to Section 53.06(e), the court observed, "This section codifies the common law rule that a minor is without legal capacity to waive service of process." *W.L.C.*, 562 S.W.2d at 455 (citing first *Sprague v. Haines*, 4 S.W. 371 (Tex. 1887), and then *DeProy v. Progakis*, 269 S.W. 78 (Tex. Comm'n App. 1925, holding approved)).[7] The court

---

[7]In *Sprague*, a land dispute, the court observed that the petition had prayed for citation to be issued against defendants—including minors—but that no service

concluded that compliance with Sections 53.06 and 54.02(b) was "mandatory and prerequisite to the juvenile court['s] jurisdiction" over the transfer, and that absent an affirmative showing of service of summons to the juvenile in the record, the juvenile court lacked jurisdiction to transfer the juvenile to district court. *Id.*

As pertinent here, four termination opinions and a criminal opinion have discussed *W.L.C.* in the service-on-minors context. *See Ex parte Rodriguez*, 466 S.W.3d 846, 850 (Tex. Crim. App. 2015); *N.J. v. Tex. Dep't of Fam. & Protective Servs.*, 613 S.W.3d 317, 321–22 (Tex. App.—Austin 2020), *vacated*, 644 S.W.3d 189 (Tex. 2022); *In re M.M.S.*, No. 14-16-00349-CV, 2016 WL 6134456, at *4 (Tex. App.—Houston [14th Dist.] Oct. 20, 2016, pet. denied) (mem. op. on reh'g); *S.A.S.*, 613 S.W.2d at 543; *see also J.M.*, 2023 WL 213928, at *3 (identifying *N.J.*'s citation of *W.L.C.*). We will begin with the termination cases, from oldest to most recent.

---

appeared in the record. 4 S.W. at 373. It noted, before reversing and remanding, "The service of process upon the minors is essential in order to confer jurisdiction upon the court, *and* to authorize the appointment of a guardian *ad litem.*" *Id.* (first emphasis added); *see Wright*, 52 S.W.2d at 251 (stating that no appointment of a guardian ad litem for a minor can be made until *after* the minor has been regularly served with process). Likewise, in *DeProy*, also a land dispute, the record showed no citation served on a minor defendant and no answer filed for him. 269 S.W. at 79. In concluding that there was no personal jurisdiction over him, the Commission of Appeals compared judgments against minors to default judgments and observed that "in judgments against minors the minor cannot appear in person nor by attorney of his selection." *Id.* The commission held that the only way the trial court could have acquired jurisdiction over the minor "was by proper service of citation on him," and only then would the trial court have had jurisdiction to appoint a guardian ad litem to represent him. *Id.*

### a. A minor's voluntary-relinquishment affidavit can waive service.

### (1) *S.A.S. v. Catholic Family Servs., Inc.*

In 1981, the Amarillo court considered *W.L.C.* and concluded that signing a voluntary-relinquishment affidavit containing a waiver of service is an exception to a minor's incapacity to waive service. *S.A.S.*, 613 S.W.2d at 543. In *S.A.S.*, the minor parent signed such a relinquishment affidavit. *Id.* at 541. Five days later, an adoption representative filed a termination suit but did not serve the minor with process, and the trial court terminated her parental rights. *Id.* The minor filed a bill of review, which was dismissed. *Id.* at 540–41. On appeal, the minor argued that she could not waive service of citation. *Id.* at 541.

The court acknowledged that as stated in *W.L.C.*, the common law requires that all minors be personally served with process. *Id.* at 543 (citing *W.L.C.*, 562 S.W.2d at 455). But the court distinguished *W.L.C.* based on its having interpreted Section 56.03(e), "which specifically excepts a child when authorizing waiver of service in certain proceedings in juvenile court" and concluded that it was inapplicable to parental-rights-termination proceedings. *Id.* Instead, the court relied on what is now Family Code Section 161.103, which provides that an affidavit for voluntary relinquishment of parental rights may be signed "by the parent, *whether or not a minor*, whose parental rights are to be relinquished." Tex. Fam. Code Ann. § 161.103(a)(1) (emphasis added). Section 161.103(c)(1) provides that the affidavit may contain "a waiver of process in a suit to terminate the parent–child relationship filed under this chapter or in a suit to

8

terminate joined with a petition for adoption." *Id.* § 161.103(c)(1); *see id.* § 102.009(a)(7) (stating that a parent is entitled to service of citation on the filing of a petition in an original suit if the parent–child relationship has not been terminated "or process has not been waived under Chapter 161"); *Brown v. McLennan Cnty. Children's Protective Servs.*, 627 S.W.2d 390, 393 (Tex. 1982) (observing that now-Section 161.103(c) has "been upheld as a permissible exception to the prohibition against pre-suit waiver"), *abrogated on other grounds by Ex parte E.H.*, 602 S.W.3d 486 (Tex. 2020).

Based on Section 161.103's plain language, the court concluded that the Legislature "has abrogated the common law rule . . . [b]y requiring the affidavit of relinquishment to be signed by the parent, whether or not a minor, and by permitting the affidavit to contain a waiver of process." *S.A.S.*, 613 S.W.2d at 543 (stating that the only reasonable conclusion is that the Legislature intended to permit a minor to waive service under the specific circumstances set out in the statute).

### (2) *In re M.M.S.*

In 2016, the Houston court disagreed with the Amarillo court's limiting *W.L.C.* to juvenile cases, pointing out that while *W.L.C.* was a juvenile case, "the [supreme] court noted [in that case] that [S]ection 53.06 was a codification of the common law rule that a minor is without legal capacity to waive service of process." *M.M.S.*, 2016 WL 6134456, at *4. The court also observed that in *W.L.C.,* the supreme court had relied on *Sprague* and *DeProy*, which were not juvenile-transfer cases. *Id.* (citing *W.L.C.*, 562 S.W.2d at 455).

9

In *M.M.S.*, the mother was a minor when the Department filed its original petition, and the record contained a copy of the citation issued to her but did not contain a citation issued to her parent, guardian, or next friend. *Id.* at *1. Not long after the Department filed its petition, she turned eighteen years old. *Id.* The next month, through her attorney, she made a general denial and signed a mediated settlement agreement (MSA) allowing the Department to be named temporary managing conservator; the trial court approved the MSA after a hearing. *Id.* at *1–2. A few months later, the Department filed an amended petition seeking termination of parental rights and noting that the mother would be served by mailing a copy of the petition to her attorney. *Id.* at *2. After a bench trial, the trial court terminated her parental rights. *Id.*

On appeal, the mother argued that the trial court had erred by failing to appoint a guardian ad litem when the suit was filed to represent her interests as a minor. *Id.* The court sustained this issue because the mother had lacked the legal capacity to receive service at the time she was served, and "[t]he record does not reflect additional personal service of citation after [her] eighteenth birthday." *Id.* at *2–5 (citing *Austin Nursing Ctr.*, 171 S.W.3d at 849). The court further observed, "When a minor is named as defendant, the court's personal jurisdiction over the minor depends on 'whether the minor's interests have been properly protected and whether a deficiency in notice or due process has been shown.'" *Id.* at *3 (quoting *Vandewater*, 907 S.W.2d at 492).

Unlike *S.A.S.*, however, the mother in *M.M.S.* had never filed a Section 161.103 affidavit of voluntary relinquishment. *Cf. id.* at *3–4 (noting that the Department had attempted to rely on Section 161.103 by analogy when arguing that the mother had appeared through her attorney). The court remanded for a new trial, holding that the mother's appearance after turning eighteen did not cure her lack of capacity at the time she was served. *Id.* at *4–5. *But see J.M.*, 2023 WL 213928, at *4 (disagreeing that parent could not enter general appearance after attaining majority).[8]

### (3) *N.J. v. Tex. Dep't of Family & Protective Servs.*

In 2020, the Austin court considered *W.L.C.*, *S.A.S.*, and *M.M.S.* in concluding that the trial court had lacked jurisdiction over a minor when it terminated her parental

---

[8]Adults can consent to personal jurisdiction through a general appearance in person or through counsel, curing any defect in method of service. *See In re Guardianship of Fairley*, 650 S.W.3d 372, 386 (Tex. 2022) (citing Tex. R. Civ. P. 120). A party enters a general appearance when he or she (1) invokes the judgment of the court on any question other than its jurisdiction; (2) recognizes by his or her acts that an action is properly pending; or (3) seeks affirmative action from the court. *Id.* When counsel for an adult in a termination suit participates in the trial by questioning witnesses and by arguing against the termination, these actions invoke the trial court's judgment on a question other than its jurisdiction, recognize that the action is properly pending, and seek affirmative action from the court. *See In re C.W.*, No. 05-25-00991-CV, 2025 WL 3722810, at *12–13 (Tex. App.—Dallas Dec. 23, 2025, no pet. h.) (mem. op.) (holding adult mother generally appeared through her own actions and those of her counsel when she appeared by Zoom at a permanency hearing and her counsel actively participated in trial without challenging personal jurisdiction); *In re M.D.M.*, 579 S.W.3d 744, 761 (Tex. App.—Houston [1st Dist.] 2019, no pet.) (holding counsel's actions at trial were sufficient to enter adult father's general appearance and constituted waiver of complaint that Department had violated his due-process rights by failing to serve him with process).

rights. *See N.J.*, 613 S.W.3d at 321–22. In *N.J.*, the Department sought to terminate the minor's parental rights after she was arrested and placed in juvenile detention for assaulting her father; her own mother's parental rights to her had already been terminated. *Id.* at 319 & n.1. No citation directed to the minor was issued or served on her, but she personally appeared a few weeks later with her court-appointed attorney at the adversary hearing. *Id.* at 319. She filed an answer to the Department's suit five days before the trial, where she testified and asked the jury not to terminate her parental rights. *Id.* She was still a minor when the trial court terminated her parental rights, and she argued on appeal that the trial court had never acquired personal jurisdiction over her because she was never served with citation. *Id.* at 319–21.

The Department did not dispute that the minor was entitled to service of citation or that she had never been served. *Id.* at 320. Instead, it argued that the record showed that before citation could be issued and served on her, she had personally appeared and participated throughout the proceedings and that these actions were sufficient to support the trial court's exercise of personal jurisdiction under Rule 120. *Id.* at 320–21.

The Austin court disagreed because "a minor cannot by her voluntary appearance waive service or consent to the jurisdiction of the court." *Id.* at 321 (citing *W.L.C.*, 562 S.W.2d at 455). The court referenced the traditional rules that when a minor is named as a party to a suit, she must be personally served with process or alternatively, in certain circumstances, may be properly joined through a legal guardian or next friend if the minor's interests have been properly protected. *Id.* at 321–22

(citing, among other authorities, Tex. R. Civ. P. 44; *Vandewater*, 907 S.W.2d at 492; and *Wheeler*, 54 Tex. at 538).

The court concluded that there had been a deficiency in notice that could not be waived by the minor's appearance because the record established that neither the minor nor a parent or person designated as her legal guardian or next friend had ever been served with citation of the Department's suit; that no one appeared in the trial court in the capacity of her next friend; and that the trial court had never appointed a guardian ad litem to protect her interests. *Id.* at 322. The court reversed the portions of the judgment terminating her parental rights and appointing the Department as managing conservator and remanded the case for a new trial. *Id.*

The minor's story did not end there, however. The Department filed a petition for review to reinstate the termination. *N.J.*, 644 S.W.3d at 190. But after the Department filed its petition for review, the mother turned eighteen and voluntarily executed an affidavit relinquishing her parental rights. *Id.* at 191. The Department then moved to dismiss the appeal for mootness; it also asked the court to vacate the trial court's judgment to the extent it depended on personal jurisdiction over the mother and to vacate the lower court's judgment and opinion. *Id.* at 191–92.

The supreme court agreed that the appeal had been mooted based on the mother's decision to voluntarily relinquish her parental rights upon attaining majority, and it vacated the court of appeals's judgment. *Id.* at 192. It also vacated the portion of the trial court's judgment pertaining to termination of her parental rights without

addressing the appeal's merits because her act of voluntarily terminating her rights "ultimately will result in the same judgment as to [her]" with no effect on the other relief granted by the trial court. *Id.* But it declined to vacate the lower court's opinion. *Id.* at 193 (concluding, without regard to merits, that vacatur would not serve the public interest).

Justice Lehrmann wrote separately to note that letting the lower court's opinion stand was "no endorsement of its reasoning or conclusion," and she observed that the lower court's opinion "muddie[d] the waters" as to how courts obtain personal jurisdiction over minor parents in termination cases. *Id.* at 194 (Lehrmann, J., concurring). In describing this muddying, she recounted that the lower court had acknowledged that despite its view that the Department had to personally serve the mother, her legal guardian, or her next friend for the trial court to obtain personal jurisdiction over her, the Department "would have run into difficulties serving *any* of these parties." *Id.* (Lehrmann, J., concurring). She also pointed out that nothing in the Family Code required the trial court to appoint a guardian ad litem for the mother (as opposed to an attorney ad litem, whom the trial court did appoint), stating, "Chapter 107 requires courts to appoint a guardian ad litem to represent a child who is the *subject* of parental termination proceedings. No provision, however, requires or even contemplates appointment of a guardian ad litem for a minor *parent*." *Id.* at 194–95 (Lehrmann, J., concurring) (citing Tex. Fam. Code Ann. § 107.011(a), which requires appointment of a guardian ad litem for the child who is a termination lawsuit's subject).

14

Justice Lehrmann posited that the Department's best option to properly join a minor parent under these circumstances was through the minor's attorney ad litem, particularly when the Family Code "seemingly indicat[es] that attorneys ad litem are authorized to accept service of citation for parties otherwise lacking capacity to consent to suit." *Id.* at 195 (Lehrmann, J., concurring) (citing Tex. Fam. Code Ann. § 107.010).[9] She also pointed out that if the lower court's analysis were correct, then the mother—and other minor parents in her position—could effectively be immune from suit in termination cases if they could not waive service under Rule 120. *Id.* (Lehrmann, J., concurring) ("That the Legislature would intend such a state of affairs blinks reality."); *see* Sandra D. Hachem, *Service Issues in CPS Cases*, 4th State Bar of Tex. Prof. Dev. Program, Adv. Child Protection Law Course 14, 14.15–.17 (2022) (noting that no statute expressly removes the disability of minority just because a child is a parent; that Section 107.010 does not "expressly require appointment of a guardian who would have

---

[9]Family Code Section 107.010 allows a trial court to appoint an attorney ad litem for a person entitled to service of citation "if the court finds that the person is incapacitated." Tex. Fam. Code Ann. § 107.010; *see id.* § 160.612(b) (requiring appointment in a parentage-adjudication proceeding of "an amicus attorney or attorney ad litem to represent a child who is a minor or is incapacitated if the child is a party or the court finds that the interests of the child are not adequately represented"), § 160.608(c) (requiring in a parentage-adjudication proceeding involving a motion for genetic testing that "a child who is a minor or is incapacitated must be represented by an amicus attorney or attorney ad litem"); *see also id.* § 160.602(a)(6) (providing that such a representative has standing because he or she is "authorized by law to act for an individual who would otherwise be entitled to maintain a proceeding but who is . . . incapacitated[] or is a minor").

to be served with process as the legal representative for the party" and does not define "incapacitated"; and that "neither Section 107.010 nor any other provision of the Family Code provides guidance on when it is 'appropriate' for an appointed attorney to seek a guardianship").

### (4) *J.M. v. Tex. Dep't of Family & Protective Servs.*

In 2023, the Austin court revisited the issue. *See J.M.*, 2023 WL 213928, at *1. In *J.M.*, the Department served the "parent of minor child [Father]," but nothing in the record indicates that the minor was personally served with citation. *Id.* However, he appeared in court with his appointed counsel the week after his mother was served, and he later filed a counterpetition to vacate his paternity acknowledgment. *Id.* Neither his mother nor any other guardian appeared on his behalf before he turned eighteen. *Id.* (citing Tex. R. Civ. P. 44). After he turned eighteen, he testified at trial, after which his parental rights were terminated. *Id.* at *2–3. On appeal, he argued that the trial court had never acquired personal jurisdiction over him because he had been a minor when the case began. *Id.* at *3. The court affirmed because he had reached majority and had entered a general appearance by the time the trial court had rendered judgment. *Id.* at *4 ("Absent further guidance from the supreme court, we will apply the general rule that an adult may waive any complaints about service by entering a general appearance.").

In upholding the termination, the court disagreed with the holding in *M.M.S.*, pointing out that after the mother in that case became an adult, she had signed an MSA

16

and then participated in a hearing to try to set it aside. *Id.* The court noted that the Houston court "did not explain why the parent could not enter a general appearance after becoming an adult, and it relied entirely on authorities concerning persons who were minors at the time the lower court rendered judgment." *Id.*

### b. The Family Code provides for other waivers.

In *Rodriguez*, a juvenile-transfer case, the Court of Criminal Appeals acknowledged *W.L.C.* and other precedent holding that a juvenile cannot waive service of the summons for a transfer hearing even if the juvenile attends the transfer hearing as "in accordance with the common-law rule that a minor does not possess the legal capacity to waive service of summons, nor can anyone waive it for him." 466 S.W.3d at 847, 850. The court nonetheless denied habeas relief when the record did not affirmatively establish on collateral attack the absence of jurisdiction to transfer the juvenile when the juvenile *could* waive a defect in the summons under Section 51.09. *Id.* at 850–55.

In reaching this conclusion, the court noted that Title 3 of the Family Code (the Juvenile Justice Code) allows a juvenile to waive "any right granted to a child by this title or by the constitution or laws of this state or the United States" in Title 3 proceedings "[u]nless a contrary intent clearly appears elsewhere in this title." *Id.* at 850 & n.22 (quoting Tex. Fam. Code Ann. § 51.09). While Section 53.06(e) explicitly provided that a juvenile could not waive service, "the unambiguous language of [Section] 51.09" permitted a waiver of *defects* in the summons's wording or the timing

17

of service when context "does not otherwise make clear that such a waiver would be prohibited." *Id.* at 851, 855.

Section 51.09 requires the following for an effective waiver of a right under Title 3: (1) the waiver is made by the child and the child's attorney; (2) the child and his or her attorney are informed of and understand the right and the possible consequences of waiving it; (3) the waiver is voluntary; and (4) the waiver is made in writing or in court proceedings that are recorded. Tex. Fam. Code Ann. § 51.09; *see also id.* § 65.008(1)–(5) (allowing a child to waive rights in truancy-court proceedings if the child and his parent or guardian are informed of the right and understand the right and possible consequences of waiving it, and the child, his or her parent or guardian, and— if represented by counsel—his or her counsel sign the waiver).

In contrast, in Title 5, which covers suits affecting the parent–child relationship (SAPCRs), we have found no similar explicit-waiver process other than Section 161.103, which allows a voluntary-relinquishment affidavit to contain a waiver of process, *see id.* § 161.103(c)(1), and Section 161.106, which allows an affidavit by a male—adult or minor—to waive his interest in a child, *see id.* § 161.106(a), (c)(1).[10] *But see id.*

_____

[10]Both sections require that the affidavit be witnessed "by two credible persons" and "verified before a person authorized to take oaths." Tex. Fam. Code Ann. §§ 161.103(a)(2)–(3), .103(c)(2)–(3). Section 161.103 also lists twelve required items, including "an allegation that termination of the parent–child relationship is in the best interest of the child," and warns that designating the Department as managing conservator makes the affidavit "irrevocable." *Id.* § 161.103(b)(1)–(12), (e). Section 161.106 also warns about irrevocability. *See id.* § 161.106(f).

§ 153.0071(d) (setting out requirements for a binding MSA: (1) prominent display that the agreement is not subject to revocation, (2) signed by each party, and (3) signed by each party's attorney, "if any, who is present at the time the agreement is signed"), (e) ("If a [MSA] meets the requirements of Subsection (d), a party is entitled to judgment on the [MSA] notwithstanding Rule [of Civil Procedure] 11 . . . or another rule of law."), (e-1) (setting out exceptions to Subsections (d) and (e) not applicable here).

## B. An affidavit of relinquishment must be voluntary.

Evidence that an affidavit of voluntary relinquishment was signed, notarized, witnessed, and executed in compliance with Section 161.103 is prima facie evidence of its validity. *In re R.B.*, 225 S.W.3d 798, 804 (Tex. App.—Fort Worth 2007, no pet.). Further, an attack on an order terminating parental rights based on an unrevoked relinquishment affidavit is limited to the specific grounds of fraud, duress, or coercion in the affidavit's execution. *In re D.S.*, 602 S.W.3d 504, 508 (Tex. 2020). "Coercion" occurs "if someone is compelled to perform an act by force or threat." *In re D.E.H.*, 301 S.W.3d 825, 828 (Tex. App.—Fort Worth 2009, pet. denied) (en banc op. on reh'g). "Duress" occurs when "due to some kind of threat, a person is incapable of exercising her free agency and unable to withhold consent." *Id.* at 829.[11]

---

[11]Mother does not raise a fraud complaint, but in *D.E.H.*, in which we addressed a parent's contention that she had involuntarily executed a relinquishment affidavit, we defined "fraud" under Section 161.211(c) as committed "through active misrepresentation or passive silence and is an act, omission, or concealment in breach of a legal duty, trust, or confidence justly imposed, when the breach causes injury to

19

**C. The trial court had personal jurisdiction over Mother in the second lawsuit and found that her affidavit was voluntary.**

Here, we recount the relevant facts with the related law.

**1. Lawsuit #1**

Mother was under the Department's temporary managing conservatorship but was residing in an unauthorized placement when she became pregnant at age fourteen. P.W., a medically fragile child, was born prematurely at home in March 2023 and then taken into a hospital's care. The Department removed P.W. from Mother in June 2023 upon P.W.'s discharge from the hospital and filed its original petition.

In its original petition, the Department sought alternatively to reunify Mother and P.W. or to terminate Mother's parental rights based on best interest and the substantive grounds of endangerment, execution of an unrevoked or irrevocable affidavit of relinquishment of parental rights, constructive abandonment, and failure to comply with court orders.[12] *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (K), (N), (O), (b)(2). Mother, who was fifteen years old by that time, filed a request for counsel and an affidavit of indigence. *See id.* § 107.013(a)(1) (stating that in a suit filed by a governmental entity in which termination of the parent–child relationship or

---

another or the taking of an undue and unconscientious advantage." 301 S.W.3d at 826, 829.

[12]The Department also sought to terminate the parental rights of P.W.'s alleged fathers in its first and second lawsuits. The trial court terminated the alleged fathers' parental rights in its October 2025 final judgment, and they have not appealed.

conservatorship appointment is requested, the court shall appoint an attorney ad litem to represent the interests of "an indigent parent of the child who responds in opposition to the termination or appointment").

On the same day that Mother requested appointed counsel, she also signed and filed a waiver of service. *But see Wright*, 52 S.W.2d at 251 (requiring a minor's service with process). The trial court appointed an attorney ad litem for Mother on the day she requested it. Mother's ad litem attorney filed an answer and moved for appointment of a guardian ad litem for Mother. The trial court appointed a guardian ad litem for Mother. *But see Kremer v. Haynie*, 67 Tex. 450, 451, 3 S.W. 676, 677 (1887) ("[T]he court had no authority to appoint a guardian *ad litem* for minors on whom the court had not acquired jurisdiction by service of process.").[13]

Neither the ad litem attorney's motion nor the order granting it indicate under what authority the trial court appointed Mother's guardian ad litem. *Compare* Tex. R. Civ. P. 173.1 ("This rule does not apply to an appointment of a guardian ad litem governed by statute or other rules."), *with* Tex. Fam. Code Ann. § 107.001(5) (defining "guardian ad litem" as "a person appointed to represent the best interests of a child"), *and id.* § 107.010 (stating that the trial court may appoint an attorney to serve as an

---

[13]The trial court also appointed an attorney ad litem and guardian ad litem for P.W. The same individual represented P.W. as both attorney ad litem and guardian ad litem, *see* Tex. Fam. Code Ann. § 107.0125, but Mother had a separately appointed attorney in each role.

attorney ad litem for a person entitled to service of citation in a suit if the court finds that the person is incapacitated and that attorney ad litem shall, "if appropriate, refer the proceeding to the proper court for guardianship proceedings").[14] However, the trial court's order states that it was made "to represent the best interests" of Mother, and it granted the guardian ad litem "immediate access to [Mother] and any information relating to [her]," including "records regarding social services, law enforcement records, school records." *See id.* § 107.002(a)(2) (stating that a child's guardian ad litem may obtain and review copies of the child's relevant medical, psychological, and school records). Mother's guardian ad litem also filed an answer for Mother. *But see id.* § 107.002(a) (stating that a Chapter 107 guardian ad litem "is not a party to the suit").

During the case's pendency, the Department placed Mother in a foster home, but that placement ended when she "caught a charge." A juvenile court adjudicated Mother delinquent for aggravated robbery and sentenced her to the Texas Juvenile Justice Department (TJJD) on a ten-year determinate sentence. The juvenile court suspended Mother's sentence, however, and placed her on seven years' probation. *See*

---

[14]Chapter 107 addresses special appointments and evaluations. *See generally* Tex. Fam. Code Ann. §§ 107.001–.308. Subchapter A addresses court-ordered representation in SAPCRs and lists the powers and duties of a child's attorney ad litem and guardian ad litem and the discretionary appointment of an incapacitated person's attorney ad litem, *see id.* §§ 107.001–.010, and Subchapter B, Part 1, addresses appointments in suits by a governmental entity, including mandatory appointment of a guardian ad litem and attorney ad litem for the subject child and mandatory appointment of an attorney ad litem for the parent, as well as the parent's attorney ad litem's powers and duties, *see id.* §§ 107.011–.017.

*generally id.* § 54.04 (discussing juvenile-disposition options). As part of her probation, Mother was placed out-of-state at a residential treatment center (RTC).[15]

The day after Mother was sentenced and transported to the RTC, her attorney ad litem moved to withdraw. The trial court allowed the withdrawal and appointed a new attorney ad litem for Mother. Mother's new attorney ad litem attended the next month's permanency hearing,[16] and in July, she filed a motion to compel discovery and for sanctions against the Department. *See id.* § 107.0131(a)(1)(C)(ii) (providing that parent's ad litem attorney may conduct discovery). Mother's new attorney ad litem also attended the August 2024 permanency hearing. *See id.* § 107.0131(a)(2)(G) (providing that a parent's ad litem attorney is entitled to attend all legal proceedings in the suit). After nine or ten months in the RTC, Mother was transferred to a foster home in Texas where she could have more contact with P.W.[17]

In November 2024, Foster Mother intervened, seeking to terminate Mother's parental rights on the same grounds as the Department and adding two drug-use

---

[15]In December 2023, Mother's guardian ad litem reported that she would not oppose an RTC to address Mother's needs. *See* Tex. Fam. Code Ann. § 107.002(j)(1)(A)–(C) (setting out a guardian ad litem's responsibilities to a child that may be placed in an RTC).

[16]The original dismissal date was in June 2024, but on May 1, 2024, in response to Mother's attorney's motion, the trial court extended the dismissal date to December 21, 2024. *See* Tex. Fam. Code Ann. § 263.401(a)–(b).

[17]Foster Mother brought P.W. to the RTC for one in-person visit with Mother, but Mother also had Zoom visits with P.W. during that time.

grounds. *See id.* § 161.001(b)(1)(P), (R).[18] She also requested permanent managing conservatorship and declared her intent to adopt P.W.

In December 2024, Mother, her attorney ad litem, and her guardian ad litem signed a Rule 11 agreement with the Department, P.W.'s guardian and attorney ad litem, Foster Mother, and Foster Mother's counsel in lieu of proceeding with the termination trial to—as Mother's attorney ad litem put it—"essentially g[e]t . . . an extension of time to try to work to get [P.W.] back." *Compare id.* § 107.002(b)(4) (stating that a child's guardian ad litem shall encourage settlement), *and id.* § 107.002(b)(3) (stating that a child's guardian ad litem shall consider the child's expressed objectives without being bound by those objectives), *with id.* § 107.0131(a)(1)(E) (stating that a parent's attorney ad litem shall encourage settlement), *and id.* § 107.0131(a)(H) (stating that a parent's attorney ad litem shall "abide by the parent's objectives for representation"). The agreement followed the required form of a binding MSA. *See id.* § 153.0071(d). The agreement also represented that each party signing it had "entered into the settlement agreement freely and without duress" and with "the opportunity to seek counsel from their attorney before signing."

---

[18]Effective September 1, 2025, Section 161.001(b)(1) was amended, repealing former Subsection (O)—the "failure to follow court orders" ground—and relabeling then-Subsections (P) and (R) as Subsections (O) and (Q). *See* Act of May 14, 2025, 89th Leg., R.S., ch. 211, §§ 2–4, 2025 Tex. Sess. Law Serv. 573, 574–75 (stating that the change in the law "applies to a [SAPCR] that is pending in a trial court on the effective date of this Act"). We refer above to the Subsections (P) and (R) in existence prior to the 2025 amendment's effective date.

24

Based on the agreement's terms, the trial court appointed the Department as P.W.'s managing conservator and made Mother a possessory conservator. *See id.* § 263.404(a) (allowing trial court to render a final order appointing Department as managing conservator without terminating parent's rights). Foster Mother was also made a possessory conservator and retained possession of P.W.

In its order, the trial court continued the appointments of both Mother's and P.W.'s attorneys and guardians ad litem for "as long as the child remains in the Conservatorship of the Department." *See id.* § 107.016(1)–(2) (addressing duration of a child's ad litem appointments and a parent's attorney ad litem's appointment). The trial court denied "all relief requested in this case[] and not expressly granted or reserved for future action via the Rule 11 Agreement" and found that the agreement had been filed with the court, stated that the agreement's terms were "incorporated into the terms of this Final Order," and ordered the parties to comply with those terms. Among other things, the agreement provided that if Mother violated any of her juvenile-court probation terms, then an irrevocable affidavit of voluntary relinquishment that she had signed that day would be accepted by the trial court, and her parental rights would be terminated. *See id.* § 161.103 (setting out voluntary-relinquishment affidavit requirements). All attorneys in the case, including Mother's and P.W.'s guardians and attorneys ad litem, signed the order "approved as to form."

The affidavit signed by Mother designated the Department as P.W.'s managing conservator, making the affidavit irrevocable, and it contained a waiver of process. *See*

25

*id.* § 161.103(c)(1), (e); *see also* Hon. Scott A. Beauchamp, *Service and Default Judgments*, 49 State Bar of Tex. Prof. Dev. Program, Advanced Family Law Course 53, 53.3 (2023) (noting that the parental-rights-relinquishment affidavit provision that includes a waiver of citation "is unusual in comparison to suits under the Texas Family Code and civil cases generally, as the waiver can be signed *before* the termination suit has been filed" (emphasis added)). Based on the record before us, Mother did not file any postjudgment motions or attempt to appeal the trial court's order. *Cf.* Tex. Fam. Code Ann. §§ 109.002(b), 263.405(a).

### 2. Facts leading to Lawsuit #2

Between January and May 2025, Mother lived in her foster home, visited P.W., attended school, and participated in the Department's services.

In February 2025, P.W.'s attorney and guardian ad litem filed a motion for entry of the relinquishment affidavit, asserting that Mother had invoked its acceptance by engaging in three instances of physical aggression. P.W.'s attorney and guardian ad litem attached the Rule 11 agreement and the trial court's December 2024 order to the motion. The automated certificate of eService reflected that Mother's guardian ad litem and her attorney ad litem were served with the motion and its attachments, but the record before us does not reflect further proceedings at that time. Instead, in March 2025, Foster Mother invited Mother to a doctor's appointment at which P.W.

was to be placed under anesthesia for a laryngeal scope.[19]  Foster Mother took a photo

of Mother that day that showed Mother asleep in the hospital bed intended for P.W.

Although the Department provided additional services to Mother during this

time—including a parenting coach, counseling, and medication management—Mother

violated the Rule 11 agreement and her juvenile probation by testing positive for

marijuana and then by running away from her foster home on May 4, 2025.[20]

### 3. Lawsuit #2

On May 13, 2025, the Department filed a new petition in the original cause

number, alleging the same grounds as the first lawsuit, including execution of an

irrevocable affidavit of relinquishment of parental rights.  *See id.* § 161.001(b)(1)(K); *see*

*also id.* § 155.002 (stating that, with exceptions not applicable here, "a court with

continuing, exclusive jurisdiction retains jurisdiction of the parties and matters provided

---

[19]Mother described the procedure as "for [P.W.'s] brain, like, her head surgery or something like that."  P.W.'s caseworker said that this surgery was for P.W.'s throat but added that P.W. had also undergone multiple brain scans regarding fluid in her head.

[20]During trial, Mother complained about her foster home and testified that she had felt she had no choice but to run away despite being aware that it would violate her probation; she blamed her caseworker.  During cross-examination, she admitted to using marijuana in the foster home and stated that she had told her caseworker that she did not want to be there "for certain reasons" but had not told him what those reasons were.  Mother's caseworker testified that Mother "felt that the foster mom had too many rules for her, and she didn't want to follow all those rules," including the one about not smoking marijuana in the home.  He denied that Mother had ever told him about some of the complaints that she made at trial.

27

by this title"),[21] § 155.003(a) (stating that, with exceptions not applicable here, a court with continuing, exclusive jurisdiction may exercise its jurisdiction to modify its order regarding conservatorship, possession of and access to the child, and child support); *In re Dep't of Fam. & Protective Servs.*, 660 S.W.3d 161, 168 (Tex. App.—San Antonio 2022, orig. proceeding) (explaining that when a trial court renders a final order establishing the Department as permanent managing conservator, the court acquires continuing jurisdiction over the child, with power to make future modifications to its order).

The petition listed Mother as a party to be served but with location "unknown," and it stated that the Department would request service of process when Mother's address became known. The record contains the automated certificate of eService showing that both Mother's attorney ad litem and her guardian ad litem received the petition.

Ten days after the Department filed its new petition, the trial court heard the motion for entry that had been filed by P.W.'s ad litem in February. The trial court bench-filed the relinquishment affidavit after—according to the Department's attorney at a later hearing—making "the determination at that hearing that it was freely and

---

[21]The record does not explicitly reflect Mother's service with process in the first lawsuit, and the Department was her managing conservator—making it a legal guardian with an interest adverse to her. *See* Tex. R. Civ. P. 173.2(a)(1). Because we do not have records of the first lawsuit's hearings, we cannot say definitively that Mother was not personally served at some point, but Mother does not argue that the trial court lacked personal jurisdiction in the first lawsuit.

voluntarily made and that it should be filed with the Court."[22]   The Department's attorney also stated that "all parties were present for the hearing."  We do not have a record of the May 23, 2025 hearing.

On June 9, 2025, the Department filed its second amended petition in which it again indicated that Mother's location was unknown and that it would request service when her address became known.[23]  The record contains an automated certificate of eService showing that Mother's attorney ad litem and her guardian ad litem received it. A permanency hearing was held the next day.  *See* Tex. Fam. Code Ann. § 263.501(a) (requiring a permanency hearing every six months if the Department "has been named as a child's managing conservator in a final order that does not include termination of parental rights," until the Department is no longer the child's managing conservator). The order after the permanency hearing reflects that Mother appeared in person and through her attorney ad litem and her guardian ad litem.  We have no record of that hearing.

---

[22]An attorney's statements are generally not evidence, but an attorney's unsworn statements at a hearing may be considered evidence in some cases, such as "when the circumstances clearly indicate that the attorney is tendering evidence on the record based on personal knowledge and the opposing party fails to object." *Vaccaro v. Raymond James & Assocs., Inc.*, 655 S.W.3d 485, 491–92 & n.5 (Tex. App.—Fort Worth 2022, no pet.) (setting out examples).

[23]The record does not contain the first amended petition but references it in Foster Mother's waiver of service acknowledging that she had been provided a copy of it.

Between May and July 2025, the Department's representatives listed Mother as "on runaway," with "address unknown," and she did not visit P.W. despite occasionally calling her caseworker and P.W.'s caseworker. Mother was found at a Wal-Mart at the end of July when her companion was caught shoplifting. She was placed in juvenile detention, and thirteen days before the termination trial, she was sentenced to five years' confinement in TJJD "with possible transfer to the Institutional Division of the Texas Department of Criminal Justice."

Mother was seventeen years old at the time of the October 2025 trial, where she appeared in person and asked the trial court for one more chance to comply with the Rule 11 agreement's terms so she could get P.W. back.[24] Mother's guardian ad litem appeared at the termination trial. Mother's attorney ad litem announced ready at the trial's beginning and did not object when the Department's counsel asked the trial court to take judicial notice of Mother's voluntary-relinquishment affidavit, which had been filed in May 2025.[25]

---

[24]P.W.'s ad litem attorney reported to the trial court that P.W. was in a "terrific" foster home and deserved permanency, that the Rule 11 agreement had been Mother's second chance, and that Mother "blew it when she ran away from her placement and when she used marijuana."

[25]Mother's caseworker, P.W.'s caseworker, Mother, and Foster Mother testified at trial, but we summarize only the testimony regarding Mother's execution of the relinquishment affidavit and Rule 11 agreement. *See supra* n.4.

During her direct examination by her attorney ad litem, Mother recalled going line-by-line in reading through the voluntary-relinquishment affidavit and agreed that her understanding had been that as long as she complied with the Rule 11 agreement's terms, P.W.'s attorney ad litem would hold onto the affidavit. Mother recalled initialing the bottom of each of the affidavit's pages and signing it in front of witnesses. Mother also agreed that when she entered the Rule 11 agreement, she had the opportunity to speak with her attorney ad litem and her guardian ad litem about the agreement and had asked them questions, and she stated that she felt like she had signed the agreement willingly and voluntarily.

Mother initially expressed that she had "[n]ot really" understood what she was doing when she executed the Rule 11 agreement and stated that her trial counsel and guardian ad litem had told her that if she did not sign it, she "would get [her] rights terminated right then." But upon further examination, Mother revealed that her attorney ad litem and her guardian ad litem had told her that if she did not sign, she would go to trial that day and that the trial court would decide whether she would lose her parental rights. Mother had preferred to enter into the agreement instead of going to trial so that she would have more time to show that she could become stable and that she could be a good parent for P.W.

At the trial's conclusion, Mother's counsel argued against the termination based on Mother's having attempted to comply with the Rule 11 agreement despite her caseworker's lack of assistance.

The trial court terminated Mother's parental rights to P.W. based on the child's best interest and the irrevocable relinquishment affidavit. *See id.* § 161.001(b)(1)(K), (b)(2). The trial court's order further states, "The Court finds that all persons entitled to citation were properly cited" and states that Mother's guardian ad litem "appeared and announced ready." Mother's attorney ad litem and her guardian ad litem signed the judgment "approved as to form." Mother's attorney ad litem did not file a motion for new trial but did file a notice of appeal and a motion to withdraw and to substitute appellate counsel.[26]

### 4. Post-trial proceedings

Mother's appellate counsel filed a timely motion for new trial and a timely request for findings of fact and conclusions of law. *See* Tex. R. Civ. P. 296.

In its findings of fact and conclusions of law, the trial court stated that Mother had appeared and had been represented by her counsel, and it again found that "all persons entitled to citation were properly cited." It made the same findings that it had made at trial regarding P.W.'s best interest and Mother's affidavit of relinquishment,[27] and Mother's appellate counsel did not file a request for additional or amended findings

---

[26]The trial court granted the motion and appointed appellate counsel for Mother.

[27]The trial court found by clear and convincing evidence that Mother "executed before or after the suit is filed an unrevoked or irrevocable affidavit of relinquishment of parental rights" and that termination of Mother's parental rights to P.W. was in the child's best interest.

32

and conclusions.  *Cf.* Tex. R. Civ. P. 298; *see Tenaska Energy, Inc. v. Ponderosa Pine Energy, LLC*, 437 S.W.3d 518, 523 (Tex. 2014) (explaining that the court defers to unchallenged fact-findings that are supported by some evidence).

In her new-trial motion, Mother argued, among other complaints, that the trial court had lacked personal jurisdiction over her based on her minority and lack of service and that the relinquishment affidavit was involuntary and improperly contingency on the Rule 11 Agreement.

Mother's appellate attorney and her guardian ad litem attended the new-trial hearing on December 5, 2025, as did P.W.'s attorney and guardian ad litem, Foster Mother's attorney, and the Department's attorney.  Mother's appellate attorney informed the trial court that the hearing was to preserve Mother's constitutional issues. He asserted that Mother had been "induced" to sign the relinquishment affidavit to avoid the first lawsuit's trial, characterizing the combination of the Rule 11 agreement and relinquishment affidavit as a "weird, Frankenstein-ish thing."  He argued that nothing in the law allowed "a contingent affidavit of relinquishment of parental rights" and that Mother's due-process rights had been violated when there had been no hearing on the affidavit's voluntariness or on whether she had violated the Rule 11 agreement. And he contended that the trial court had no jurisdiction to hear the second lawsuit because Mother had not been served with the petition and had not signed a waiver.

The Department's counsel responded that the trial court had found the relinquishment freely and voluntarily made at the May 23, 2025 hearing and pointed out

that Mother had admitted at trial "that she had been told that she had an opportunity to go to trial, to present witnesses, and that the judge would ultimately decide, but that she still decided to sign the voluntary relinquishment" and that there was no evidence of duress or coercion.

P.W.'s guardian and attorney ad litem stated that she had set the motion for entry of the relinquishment affidavit for a hearing in May and that the trial court had accepted it and bench-filed it. She also reminded the trial court about the case's background, stating, "[T]he reason why we were forced to do this, quote, Frankenstein Rule 11 agreement is because when we showed up for the original final trial, we found out that the [Department's then-attorney] . . . had not responded to discovery, and therefore, all of the witnesses would have been excluded."

Foster Mother's counsel stated that she "would just echo what [the Department's attorney] stated" in that there was a hearing on the entry of the relinquishment affidavit, that "there has been no challenge to . . . the affidavit and whether it was properly executed," and that the record showed that Mother "had proper representation by both an attorney ad litem and a guardian ad litem throughout the case."

No testimony was presented at the new-trial hearing, and the trial court denied the new-trial motion.

### 5. Analysis

Because Mother's three points are interrelated, we will discuss them together, but we must begin and conclude with her third point, challenging the trial court's personal

jurisdiction over her. The record reflects that Mother signed an irrevocable affidavit of voluntary relinquishment containing a waiver of service of process under Section 161.103, which allows a parent, "whether or not a minor," to do so. *See* Tex. Fam. Code Ann. § 161.103(a)(1), (c)(1). We agree with the Amarillo court that the Legislature has specifically granted legal capacity to a minor under the circumstances presented by Section 161.103. *See S.A.S.*, 613 S.W.2d at 543; *see also* Beauchamp, *supra* at 53.22 (explaining that an exception to a minor's incapacity to make a voluntary appearance, sign a waiver of service, or take other voluntary acts to submit to a court's jurisdiction "occurs whe[n] a minor executes an affidavit of voluntary relinquishment [of] parental rights that includes a waiver of service").[28]

Further, because evidence that an affidavit of voluntary relinquishment has been signed, notarized, witnessed, and executed in compliance with Section 161.103 is prima facie evidence of its validity, *see R.B.*, 225 S.W.3d at 804, Mother's waiver of service before the second lawsuit's filing was effective if her decision to execute the affidavit

---

[28]Other exceptions to a minor parent's incapacity include the authority to maintain a proceeding on behalf of his or her child for child support, *see* Tex. Fam. Code Ann. § 159.302; and—under different circumstances—to consent to the child's medical, dental, psychological, or surgical treatment, *see id.* § 32.003(a)(6), (b); *see also* Hachem, *supra* at 14.17 (stating that along with Section 161.103's voluntary-relinquishment affidavit, "these authorities [Sections 32.003 and 159.302] indicate a minor parent is given specific statutory authority to make legal decisions for her child . . . [and] together indicate a minor-parent statutorily assumes unique rights that require the capacity of the minor-parent to be treated differently in a suit that involves that minor-parent's legal rights in a parent–child relationship").

was not the product of duress or coercion. *See* Tex. Fam. Code Ann. § 161.211(c); *D.S.*, 602 S.W.3d at 508 ("When parental rights are terminated based on an affidavit voluntarily relinquishing those rights, [S]ection 161.211(c) of the Texas Family Code limits . . . attacks on the termination order to specific grounds: fraud, duress, or coercion in the execution of the affidavit."). We thus turn to Mother's first and second points.

Mother argues in her second point that she executed the affidavit under duress and coercion, and she directs us to the portion of her testimony that she asserts shows that she signed it under the coercion of what she characterizes as her counsel's legally incorrect advice "that she had no choice but to sign it or lose her child."[29] [ But when viewed in context, as set out above, the record does not support her assertions. *See D.E.H.*, 301 S.W.3d at 828–29 (defining coercion and duress); *In re M.A.W.*, 31 S.W.3d 372, 375–76 (Tex. App.—Corpus Christi–Edinburg 2000, no pet.) (affirming termination based on irrevocable relinquishment affidavit when mother's new-trial evidence did not show duress, overreaching, coercion, or fraud but rather that she had changed her mind).

As set out above, at trial, the trial court could have reasonably found by clear and convincing evidence that Mother had executed the affidavit voluntarily, knowingly, and intelligently with full awareness of its legal consequences based on her trial testimony

---

[29]Mother appears to question some of her trial counsel's choices but does not raise an ineffective-assistance point. *Cf. In re D.T.*, 625 S.W.3d 62, 73 (Tex. 2021).

36

and on its findings at the unrecorded May 23, 2025 hearing, when it bench-filed the affidavit. *See R.B.*, 225 S.W.3d at 806 ("While appellants may have been under considerable pressure to make a decision [about whether to sign the relinquishment affidavits], the record shows that they were represented by counsel, were aware of the documents they were signing, and understood the consequences."); *In re A.P.*, No. 02-15-00176-CV, 2015 WL 7304051, at *8–9 (Tex. App.—Fort Worth Nov. 19, 2015, no pet.) (mem. op.) (stating that the parent failed to demonstrate that he was incapable of exercising his free agency and unable to withhold his consent when he failed to testify to any circumstances supporting an allegation of duress); *see also In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009) (recognizing that the factfinder, not the appellate court, is the sole arbiter of the witnesses' credibility and demeanor). Because no evidence to the contrary was brought forth at the new-trial hearing, we overrule Mother's second point.

Finally, under Mother's first point, she concedes that her affidavit contained all of Section 161.103's statutory language, but she nonetheless argues that the trial court erred by granting termination when the affidavit was improperly made contingent on a Rule 11 agreement and complains that the Family Code does not provide for contingent affidavits of relinquishment. However, Mother ignores that nothing in her affidavit's contents made it expressly contingent on anything—either the Rule 11 agreement or any specific action or inaction.[30] It was, on its face, enforceable against Mother when

---

[30]In her first point, Mother also raises a variety of due-process-based policy complaints that she did not make in the trial court or in her postjudgment motion

37

signed. And the Rule 11 Agreement, which complied with the Family Code's MSA requirements, *see* Tex. Fam. Code Ann. § 153.0071(d),[31] set out requirements to which Mother agreed (with the assistance of her ad litems) in exchange for the other parties' agreement not to immediately file the affidavit but rather to give Mother additional time to show she could be a good parent to P.W.[32]

Further, Section 161.211(c)'s restrictions do not allow Mother to make these complaints about the affidavit. *See id.* § 161.211(c) (limiting direct or collateral attack on order terminating parental rights based on unrevoked affidavit of relinquishment to "issues relating to fraud, duress, or coercion in the execution of the affidavit"); *see also D.S.*, 602 S.W.3d at 509 (holding Section 161.211(c)'s plain language forecloses a

---

regarding her characterization of the affidavit as contingent. *See* Tex. R. App. P. 33.1; *J.P.-L.*, 592 S.W.3d at 575; *see In re K.A.F.*, 160 S.W.3d 923, 928 (Tex. 2005) (requiring preservation of constitution-based complaints in termination cases). Mother raises additional due-process complaints about the affidavit under her third point, but like the arguments under her first point, she did not raise them at trial or in her new-trial motion. *See* Tex. R. App. P. 33.1.

[31]A MSA is binding on the parties if the agreement: (1) provides, in a prominently displayed statement that is in boldfaced type or capital letters or underlined, that the agreement is not subject to revocation; (2) is signed by each party to the agreement; and (3) is signed by the party's attorney, if any, who is present at the time the agreement is signed. Tex. Fam. Code Ann. § 153.0071(d).

[32]Although Mother complains that the relinquishment affidavit's "conditional nature" was not referenced in the trial court's findings of fact and conclusions of law, counsel did not seek amended or additional findings and conclusions.

collateral attack on an erroneous home-state determination even if it implicates a trial court's subject matter jurisdiction). We overrule Mother's first point.

Having rejected Mother's challenges to the affidavit, we further hold that its waiver of process was effective in the subsequently filed termination proceeding. We therefore overrule her third point challenging personal jurisdiction.

### III. CONCLUSION

Having overruled Mother's three points, we affirm the trial court's judgment.

/s/ Dana Womack

Dana Womack
Justice

Delivered: February 26, 2026